UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANAMIRIA MADRIGAL, individually and doing business as Atzek Cellular, a sole proprietorship; and ATZEK CELLULAR,INC. | 09-CV-00033-OWW-SMS |
| | MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION TO COMPEL ARBITRATION |
| Plaintiffs, | |
| v. | |
| NEW CINGULAR WIRELESS SERVICES, INC., a Corporation; and AT&T MOBILITY, LLC, a Corporation | |
| Defendants. | |

## I.   INTRODUCTION

Before the court is a motion to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, brought by Defendants New Cingular Wireless Services, Inc. and AT&T Mobility, LCC (collectively "Defendants").  Defendants contend that the four claims asserted by Plaintiffs Anamiria Madrigal and her company Atzek Cellular, Inc. ("Plaintiffs") in the First Amended Complaint ("FAC"), and the counterclaims asserted by Defendants in their responsive pleading, are subject to an arbitration clause in an Exclusive Dealer Agreement executed between the parties.

The following background facts are taken from the parties' submissions in connection with the motion and other documents on file in this case.

## II.   BACKGROUND

A.   The Dealer Agreement

On or about April 1, 2002, Plaintiff Anamiria Madrigal and AT&T Wireless Services, Inc. entered into an Exclusive Dealer

1

1  Agreement ("Dealer Agreement"). (Doc. 13 at 3; Doc. 16 at 10.)[1]
2  The terms of the Dealer Agreement authorized Madrigal to market
3  wireless products and services to customers of AT&T Wireless. (Doc.
4  13 at 3.)

5      Madrigal opened and operated several retail stores under the
6  name "Aztek Cellular." (Doc. 13 at 3; Doc. 16 at 10.)  After "Atzek
7  Cellular" incorporated, on August 8, 2002, Madrigal assigned her
8  rights under the Dealer Agreement to Atzek Cellular, Inc. (Woosley
9  Decl. ¶ 5, Ex. C.)  The term of the Dealer Agreement was two years
10 with automatic one-year extensions if not terminated by either
11 party. (Doc. 13 at 4; Doc. 16 at 10.)  The Dealer Agreement was
12 renewed in 2004 and 2005. (Doc. 13 at 4; Doc. 16 at 10.)

13     During the term of the Dealer Agreement, Plaintiffs
14 experienced considerable financial success while operating nine
15 retail stores. (Doc. 13 at 4.)

16 **B.    The Switch From AT&T To Cingular And The Commission Dispute**

17     In 2004, Cingular Wireless acquired AT&T Wireless after which
18 AT&T Wireless was renamed New Cingular Wireless Services, Inc.
19 (Doc. 13 at 2.)  As part of the conversion from AT&T Wireless to
20 Cingular, Plaintiffs were offered "Special Promotional Incentives
21 Funds" ("SPIFs"). (Doc. 13 at 5.)  For former AT&T Wireless
22 customers Plaintiffs successfully transferred to Cingular and/or
23 sold additional data features, Plaintiffs earned SPIFs (or
24 commissions) as incentive compensation. (*Id.*)

25     By the fall of 2005, Plaintiffs calculated that they were owed
26

27     [1] Document ("Doc.") 13 is Plaintiffs' FAC, and Doc. 16 is the
28 Order After Scheduling Conference.

1   more than $2,000,000 in unpaid and improperly calculated
2   commissions. (Doc. 13 at 5; Doc. 16 at 4-5.) However, calculations
3   of SPIFs were complicated and Cingular contested the unpaid amount
4   claimed by Plaintiffs. (Doc. 13 at 5.)  Plaintiffs were offered
5   $475,000 in settlement. (Doc. 13 at 5; Doc. 16 at 5.)  Plaintiffs
6   rejected the offer and alleged that Cingular's calculations were
7   erroneous. (Doc. 13 at 5; Doc. 16 at 5.)  Plaintiffs maintain that
8   Cingular "had no accounting reflecting their own calculations were
9   in error." (Doc. 13 at 5; Doc. 16 at 5.)  Cingular then reduced its
10  offer to $435,000, without providing supporting documentation.
11  (Doc. 13 at 5; Doc. 16 at 5.)

12      After Plaintiffs refused to compromise, on December 24, 2005,
13  Defendants served Plaintiffs with a 90-day written notice of
14  termination of the Dealer Agreement. (Doc. 13 at 4; Doc. 16 at 10.)
15  On or about April 1, 2006, the Dealer Agreement terminated. (Doc.
16  13 at 8; Doc. 16 at 10.)  Cingular made a final attempt to settle
17  the disputed commissions for $149,275. (Doc. 13 at 5; Doc. 16 at
18  5.)  Plaintiffs rejected the offer.

19      Subsequently, Plaintiffs, through counsel, requested mediation
20  or, in the alternative, arbitration of the commission dispute.
21  (Swingle Decl. Ex. A.)  The parties agreed to mediate (Swingle
22  Decl. Exs. B-C), but the mediation never occurred.  After retaining
23  new counsel, Plaintiffs requested arbitration of the commission
24  claims. (Cornwell Decl. Exs. A-B.)

25      A couple months later, apart from the commission claims,
26  Plaintiff Madrigal filed a state-court complaint asserting
27  *statutory* claims arising from termination of the Dealer Agreement.

28

                                    3

**C.    Procedural History**

On November 18, 2008, Plaintiff Madrigal filed a complaint in Fresno County Superior Court alleging four statutory causes of action.    On January 7, 2009, the action was removed to federal court on diversity of citizenship grounds.    On March 5, 2009, Plaintiffs[2] filed a FAC alleging the same four statutory causes of action, which are: (1) a violation of the California Fair Dealership Law, Civil Code §§ 80-86; (2) a violation of the California Franchise Relations Act, Bus. & Prof. Code § 20000 et seq.; (3) a violation of the New York Franchise Law, N.Y. Gen. Bus. Law § 680; and (4) a violation of the California Unfair Competition Law, Bus. & Prof. Code § 17200 et seq.   All of these claims allege, among other things, that the termination of the Dealer Agreement was unlawful and part of a scheme to put pressure on Plaintiffs to settle the commission dispute on terms adverse to Plaintiffs.

Defendants have demanded that Plaintiffs arbitrate their claims in this lawsuit. (De Liberty Decl. Ex. D.)  Plaintiffs have resisted arbitration of their statutory claims despite their willingness to arbitrate the dispute over the commissions. (Cornwell Decl. Ex. B.)

**III.    ARBITRATION UNDER THE FAA**

The FAA represents a "liberal federal policy favoring arbitration agreements." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991) (internal quotation marks omitted).   The "central purpose of the [FAA] [is] to ensure that private

---

[2] **The claims in the first amended complaint are asserted by Plaintiff Madrigal and Plaintiff Atzek Cellular, Inc.**

**4**

agreements to arbitrate are enforced according to their terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53-54 (1995).  The "preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, a concern which requires that [courts] rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985) (internal quotation marks omitted).

In pertinent part, section 2 of the FAA provides that a "written" arbitration provision in any "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The term "involving commerce" in section 2 is the "functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause Power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam).  The FAA "provides for the enforcement of arbitration agreements within the full reach of the Commerce Clause." *Id.* (internal quotation marks omitted).  To fall within the FAA, the "contract evidencing a transaction involving commerce," in which an arbitration agreement is embedded, need not be one "within the flow of interstate commerce," nor one that, "taken alone," has "a substantial effect on interstate commerce." *Id.* (internal quotation marks omitted).  "Congress' Commerce Clause power may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice

1  ... subject to federal control." *Id*. 56-57 (internal quotation
2  marks omitted).

3       Defendants engage in cellular business throughout the United
4  States, entering into dealership agreements across the country.
5  (Woosley Decl. ¶¶ 9-11.)   The Dealer Agreement here, reached
6  between parties from different states, involves the provision of
7  cellular services to end customers over a significant period of
8  time.   The Dealer Agreement represents a transaction "involving
9  commerce," and even if there were "any . . . doubt about the
10 magnitude of the impact on interstate commerce caused by the
11 particular" Dealer Agreement in this case, "that doubt would
12 dissipate upon consideration of the "general practice th[at]
13 transaction[] represent[s]." *Citizens Bank*, 539 U.S. at 57-58.   "No
14 elaborate explanation is needed to make evident the broad impact
15 [cellular services have] on the national economy." *Id.* at 58.   The
16 written arbitration agreement here is embedded in a contract
17 evidencing a transaction involving commerce within the meaning of
18 the FAA.

19       Section 4 of the FAA "authorizes a federal district court to
20 issue an order compelling arbitration if there has been a 'failure,
21 neglect, or refusal' to comply with the arbitration agreement."
22 *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)
23 (quoting 9 U.S.C. § 4).

24       When a party brings a motion to compel arbitration under
25 section 4, a threshold inquiry is whether an "arbitration"
26 agreement exists. *See Chiron Corp. v. Ortho Diagnostic Sys.*, *Inc.*,
27 207 F.3d 1126, 1130 (9th Cir. 2000).   No party disputes that the
28

Dealer Agreement contains an arbitration agreement.[3]

The next inquiry deals with the scope of the arbitration agreement. "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). "Accordingly, the [next] task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp*., 473 U.S. at 626.

In opposition to the motion to compel arbitration, Plaintiffs contend that the scope of the arbitration agreement does not encompass the statutory claims in the FAC. Alternatively, Plaintiffs argue that even if the statutory claims fall within the scope of the arbitration agreement, the arbitration agreement is unconscionable (under California law) and thus invalid. Finally, Plaintiffs argue that even if the arbitration agreement encompasses the statutory claims and is not unconscionable, Defendants waived their right to enforce the arbitration agreement. For the reasons that follow, Plaintiffs' first and second challenge to the arbitration agreement as to its scope and validity are disputes that the parties agreed to arbitrate. Plaintiffs' third challenge (on waiver grounds), which the court can decide, lacks merit.

### IV. DISCUSSION

**A.    Scope Of The Arbitration Agreement**

---

[3] Relatedly, no party disputes that both Plaintiffs (Madrigal and her company Atzek Cellular, Inc.) and both Defendants are subject to the arbitration agreement.

**7**

1
2
3
4

Under the FAA any doubts regarding the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The arbitration clause (section 10.2.1) *in haec verba* reads:

5
6
7
8

> Except as stated in section 10.2.4 of this Agreement, all claims (including counterclaims and cross-claims) and disputes between Dealer and Company must be resolved by submission to binding arbitration.  The parties must submit any such disputes to the office of the American Arbitration Association ("AAA") nearest to Dealer within the Area, to be decided under the then current AAA commercial arbitration rules.

9
10
11
12
13
14
15

(Woolsey Decl. Ex. B at 12)(emphasis added).[4]  Plaintiffs argue that the statutory causes of action in their FAC do not fall within the scope of the arbitration provision because they are neither "claims" nor "disputes" (both of which are undefined terms in the agreement).  To support their argument, Plaintiffs cite to section 10.1 of the Dealer Agreement, which immediately precedes the section on arbitration.  Section 10.1 specifies:

16
17
18

> Dealer must notify Company in writing of any *grievance* or dispute it may have regarding the Agreement or its relationship with Company within 120 days of the date the dealer became aware of this grievance or dispute.

19
20
21
22
23
24
25
26

(Emphasis added.)  According to Plaintiffs, each one of their statutory causes of action is a "grievance" (which is also an undefined term).  Because the arbitration agreement applies to "claims" and "disputes" but does not mention "grievances," Plaintiffs contend they need not arbitrate their statutory causes of action. Regardless of whether Plaintiffs' contention has merit, the parties have agreed to arbitrate the scope of the arbitration agreement.

27
28

---

[4]   No party contends that section 10.2.4 exempts from arbitration any of the claims at issue in this lawsuit.

8

Normally, whether a particular dispute falls within the scope of an arbitration agreement is a question for the court to resolve. "The question whether the parties have submitted a particular dispute to arbitration" is considered a "question of arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (emphasis removed). As a matter of federal law under the FAA, a "question of arbitrability" presents "an issue for judicial determination *[u]nless* the parties clearly and unmistakably provide otherwise." *Id.* (emphasis added) (alteration in original) (internal quotation marks omitted); *see also First Options*, 514 U.S. at 944. In other words, questions of arbitrability are presumptively for a court to decide.  This presumption is overcome in this case.

The arbitration agreement calls for arbitration by the AAA, "to be decided under the then current AAA commercial arbitration rules." *See* section 10.2.1.  In their moving papers, Defendants attached a copy of the AAA commercial arbitration rules. (De Liberty Decl. Ex. A.)  In their briefing, Plaintiffs concede that these are the operative AAA rules. (*See* Doc. 20 at 17 & n.7.)

Rule 7 of the AAA commercial arbitration rules provides:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, *scope* or validity of the arbitration agreement.

Rule R-7(a) (emphasis added).

Numerous courts have examined the language in Rule 7 and concluded that, when incorporated into an arbitration agreement, it clearly and unmistakable evidences the parties' intent to arbitrate the scope of the arbitration agreement, *i.e.*, to arbitrate whether a claim or claims fall(s) within the scope of the arbitration

9

agreement. *See Awuah v. Coverall N. Am., Inc.,* 554 F.3d 7, 11 (1st Cir. 2009) (stating that Rule 7 "says plainly that the arbitrator may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement.' This is about as 'clear and unmistakable' as language can get . . . ."); *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) (concluding that Rule 7 "constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator"); *Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1373 (Fed. Cir. 2006) (concluding that identical language in another AAA rule "clearly and unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an arbitrator"); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (concluding that Rule 7 "serves as clear and unmistakable evidence of the parties' intent to delegate" "issues of arbitrability" "to an arbitrator"); *Clarium Capital Mgmt. LLC v. Choudhury*, Nos. C 08-5157SBA, O6-5255, 2009 WL 331588, at *5 (N.D. Cal. Feb. 11, 2009) (concluding that Rule 1 of Article 15 of the AAA rules on international dispute resolution, which contains language identical to Rule 7 of the commercial arbitration rules, represents "'clear and unmistakable' evidence of the parties' intent to delegate the issue of arbitrability to the arbitrator"); *Clyde Bergemann, Inc. v. Sullivan, Higgins & Brion, PPE LLC*, No. 08-162-KI, 2008 WL 2116908, at *2-3 (D. Or. May 14, 2008) (concluding that a rule in the employment dispute resolution rules of the AAA, which contains language identical to Rule 7, "clearly and unmistakably showed the parties' intent to delegate the issue of determining arbitrability to an arbitrator"); *VISA*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

*USA, Inc. v. Maritz Inc.*, No. C 07-05585 JSW, 2008 WL 744832, at *5 (N.D. Cal. Mar. 18, 2008) (concluding that the incorporation of Rule 7 shows that the parties "clearly and unmistakenly agreed that questions of arbitrability would be submitted to arbitration for resolution"); *Grynberg v. BP P.L.C.*, 585 F. Supp. 2d 50, 55 (D.D.C. 2008) (concluding that another AAA rule, which contains language identical to Rule 7, "constitutes clear and unmistakable evidence that the parties intended to submit the threshold question of arbitrability to the arbitrator himself"); *Rodriguez v. Am. Techs. Inc.*, 136 Cal. App. 4th 1110, 1123 (2006) (concluding that by incorporating Rule 8 of the AAA's construction industry rules, which contains language identical to Rule 7, "the parties clearly and unmistakably agreed to have the arbitrator determine the scope of the arbitration clause"); *see also Ariza v. Autonation, Inc.*, 317 F. App'x 662, 664 (9th Cir. Mar. 5, 2009) (citing *Rodriquez* with approval on this point and using it for analogical support); *Aceves v. Autonation, Inc.*, 317 F. App'x 665, 666-67 (9th Cir. Mar. 5, 2009) (same).

19
20
21
22

Here the arbitration agreement specifies that "all claims" and "disputes" are subject to arbitration by the AAA, and it explicitly states that the "AAA commercial arbitration rules" govern. Rule 7 is one of those rules.[5] Consistent with the great weight of

23
24
25
26
27
28

---

[5] The parties agree that the commercial arbitration rules attached to Woolsey's Declaration, which contain Rule 7, represent the "then current" AAA commercial arbitration rules as stated in the arbitration agreement. Rule 7, formerly Rule 8, has been in existence since at least 1999. *See Grynberg*, 585 F. Supp. 2d at 54 (discussing Rule 8 of the 1999 commercial arbitration rules which provides that the "[a]rbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to

authority, by incorporating the language of Rule 7 of the AAA commercial arbitration rules into their arbitration agreement, the parties clearly and unmistakably expressed their intent to have the arbitrator decide disputes over the scope of the arbitration agreement.   Accordingly, Defendants' motion to compel arbitration is GRANTED.   The arbitrator, not the court, must decide whether the claims in this lawsuit fall within the scope of the arbitration agreement.[6]

the existence, scope or validity of the arbitration agreement."); *see also Book Depot P'ship v. Am. Book Co.*, No. 3:05-CV-163, 2005 WL 1513155, at *3 (E.D. Tenn. June 24, 2005) (discussing Rule 7 of the 2003 AAA Commercial Arbitration Rules which provides that the "[a]rbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." (alteration removed)).   Accordingly, at the time Plaintiff Madrigal entered into the Dealer Agreement in April 2002, when her corporation Plaintiff Atzek Cellular, Inc. assented to the Dealer Agreement in August 2002, when the Dealer Agreement was renewed in 2004 and 2005, and before it expired in April 2006, Rule 7 or its language was (and continues to be) part of the AAA commercial arbitration rules.

    [6]   Courts that have concluded that the parties clearly and unmistakably agreed to have the arbitrator (not the court) determine the scope of the arbitration agreement have, before sending the matter to arbitration, inquired further as to whether the "assertion of arbitrability is wholly groundless." *Qualcomm Inc.*, 466 F.3d at 1371.   This "wholly groundless" inquiry prevents a party from "asserting any [substantive] claim at all, no matter how divorced from the parties' agreement, [only] to force an arbitration" over the scope of the arbitration agreement. *Id.* at 1373 n.5.   The assertion that the claims in this case fall within the scope of the arbitration agreement is not "wholly groundless." The claims arose out of the parties relationship and may or may not fall within the ambit of the "claims" and "disputes" language.   To respect the province of the arbitrator, no opinion is expressed on whether the claims in this case actually fall within the scope of the arbitration agreement.

**B.   Validity Of Arbitration Agreement — Unconscionability**

Arbitration agreements are subject to normal contract defenses arising under state law such as fraud, duress, and unconscionability. *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687 (1996). Plaintiffs argue that the arbitration agreement is unconscionable given certain of its features, *e.g.*, it places limits on discovery and requires the payment of arbitration fees which Plaintiffs believe are excessive.

Assuming, without deciding, that the court can determine whether Plaintiffs' claims fall within the scope of the arbitration agreement, and further assuming, without deciding, that they do, Plaintiffs' challenge to the validity of the arbitration agreement on unconscionability grounds cannot be judicially determined. The parties have clearly and unmistakably provided that arbitrator is empowered to determine the "*validity* of the arbitration agreement" (as well as its scope). Rule 7.

Courts have recognized that "the validity of an arbitration clause is itself a matter for the arbitrator where the agreement so provides." *Awuah*, 554 F.3d at 11; *see also Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (concluding that by incorporating the AAA commercial arbitration rules into their arbitration agreement, and specifically the rule which provides that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," the "parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid"); *Monex Deposit Co. v. Gilliam*, 616 F. Supp. 2d 1023, 1026 (C.D. Cal.

13

2009).  By incorporating Rule 7 of the AAA commercial arbitration rules into their arbitration agreement, the parties clearly and unmistakably expressed their intent to have the arbitrator decide disputes over the validity of the arbitration agreement.  Referring Plaintiffs' dispute over the validity of the arbitration agreement to the arbitrator, which is what the parties provided for, is consistent with the FAA.

The "central purpose of the [FAA] [is] to ensure that private agreements to arbitrate are enforced *according to their terms*." *Mastrobuono*, 514 U.S. at 53-54 (emphasis added).  Section 4 of the FAA authorizes a district court to compel arbitration when the court is "satisfied" that "the making of the agreement for arbitration" is "not in issue."  9 U.S.C. § 4.  In cases where the making of the agreement to arbitrate is at issue, the court should decide whether an arbitration agreement was ever concluded. *See Prima Pain Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself-an issue which goes to the 'making' of the agreement to arbitrate-the federal court may proceed to adjudicate it.").  There is no such dispute here.

Plaintiffs' unconscionability challenge assumes the existence and making of the arbitration agreement.  Contending the arbitration agreement is unconscionable, Plaintiffs dispute the validity of the agreement made, not that they ever made an arbitration agreement to begin with.[7]  Accordingly, § 4 does not

---

[7] In her declaration, Plaintiff Madrigal explains that when she entered into the Dealer Agreement she had been working with one of AT&T Wireless's exclusive dealers as an employee managing

preclude an order compelling Plaintiffs to comply with their agreement to arbitrate their dispute as to the validity of the arbitration agreement.  Even though an arbitrator may ultimately conclude that the arbitration agreement is invalid and that Plaintiffs need not arbitrate their statutory claims, this does not eviscerate the presently operative and more limited provision that the arbitrator must decide disputes over the validity of the arbitration agreement in the first instance. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) (recognizing that, under the FAA, a court may "enforce an arbitration agreement in a contract that the arbitrator later finds to be void" even though this would also render the arbitration provision void); *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 (2003) (concluding that the arbitration agreements at issue were initially enforceable and compelling arbitration even though the arbitrator may interpret the arbitration agreements in such a manner as to "render the parties' [arbitration] agreements unenforceable"); *see also Green Tree Fin. Corp v. Bazzle*, 539 U.S. 444, 452 (2003) (plurality opinion with Stevens, J., concurring in judgment)

---

several locations.  She "interpreted" provisions of the Dealer Agreement in light of this "background" and "from this perspective."  She states that "where the arbitration clause in the Dealer Agreement referred to 'claims' and 'disputes,' I assumed it meant business disagreements over compensation — including commissions, chargebacks, and special incentives. . ." (Madrigal Decl. ¶¶ 3-4.)  Documents in the record also show that Plaintiffs have requested and been willing to arbitrate their commission claims.  Plaintiff Madrigal's declaration, and the requests for arbitration of the commission claims, confirm that the parties made an arbitration agreement even though disputes now exist over its scope and validity with respect to the statutory claims.

(noting that "*in the absence of clea[r] and unmistakabl[e] evidence to the contrary,*" "in certain limited circumstances, courts assume the parties intended courts, not arbitrators, to decide" certain "gateway matters, such as whether the parties have a valid arbitration agreement at all") (emphasis added) (alterations in original) (internal quotation marks omitted).

Submitting Plaintiffs dispute over the validity of the arbitration agreement, as the parties have provided, is also reasonable in light of the nature of Plaintiffs' challenge. Plaintiffs argue that the arbitration agreement is unconscionable because, among other things, the face of the arbitration agreement purports to limit discovery (the agreement provides for four depositions, one document request and one interrogatory). Plaintiffs also argue that the arbitration agreement is unconscionable because it requires Plaintiffs to pay allegedly "e[]xorbitant" arbitration fees.  The merits of these arguments are directly linked to an interpretation and understanding of the AAA commercial arbitration rules.

The commercial arbitration rules specifically provide that the arbitrator, "[a]t the request of any party or at the discretion of the arbitrator," "may direct" "the production of documents and other information." Rule 21.  Moreover, as specified in the "Introduction" section of the AAA commercial arbitration rules, if the parties proceed under the additional rules of AAA commercial arbitration for "Large, Complex Cases," the arbitrator is given "broad" "authority to order and control discovery, including depositions."  Accordingly, Plaintiffs' argument that the arbitration agreement is unconscionable because it unduly limits

16

discovery can be properly analyzed by taking into account the extent to which parties can obtain discovery under the AAA rules. This determination, however, involves an interpretation of the AAA rules, something which arbitrators, not courts, are better equipped to provide. *See Howsam*, 537 U.S. at 85 ("Moreover, the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it.").   The AAA rules themselves, which the parties have incorporated into their agreement, provide that the arbitrator is empowered to "interpret and apply these rules" as they relate to his "powers and duties." Rule 53.

Similarly, as to Plaintiffs' argument that the "arbitration fees" are excessive and thus render the agreement unconscionable, this argument also implicates AAA rules.  For example, under Rule 49 of the AAA commercial arbitration rules, the AAA can "defer or reduce" administrative fees in the event of "extreme hardship." Moreover, Rule 49 also states that the "filing fee" is "subject to final apportionment by the arbitrator in the award." *See also* Rule 43(c) (providing that, in the final award, the "arbitrator may apportion" the "fees, expenses, and compensation among the parties in such amounts as the arbitrator determines appropriate").  Under what circumstances and the extent to which a party can obtain a reduction of fees or an apportionment thereof under the AAA rules is something which arbitrators, not courts, are in a better position to evaluate.[8]

---

[8] **Plaintiffs based their estimation of administrative fees on the estimated monetary amount of their claims.  Plaintiffs have already requested that arbitration proceed on their commission**

1  For the foregoing reasons, Defendants' motion to compel
2  arbitration is GRANTED.   The arbitrator, not the court, must
3  determine the validity of the arbitration agreement in light of
4  Plaintiffs' arguments.

5  **C.   Enforceability Of Arbitration Agreement – Waiver**

6  Plaintiffs argue that even if the arbitration agreement covers
7  their statutory claim and is not unconscionable, Defendants have
8  nonetheless waived their right to arbitrate.   "[A]llegation[s] of
9  waiver, delay, or a like defense to arbitrability" are
10 presumptively for the arbitrator to decide.  *Moses H Cone*, 460 U.S.
11 at 24-25.    Notwithstanding this rule, federal courts (not
12 arbitrators) often decide whether a party's pre-motion to compel
13 conduct amounts to a waiver of the right to arbitrate. *See, e.g.,*
14 *Chappel v. Laboratory Corp. of Am.*, 232 F.3d 719, 724 (9th Cir.
15 2000).    Rule 7 of the AAA commercial arbitration rules does not
16 address this issue.   Rule 7 empowers the arbitrator to decide the
17 "scope" and "validity" of the arbitration agreement.   A perfectly
18 valid arbitration agreement may cover a particular substantive
19 claim, but the party seeking enforcement of the arbitration
20 agreement may have waived its right to arbitrate.    Accordingly,
21 Rule 7 does not resolve Plaintiffs' waiver argument.

22

23 claims (which exceed $2,000,000 according to Plaintiffs).    It is
24 not clear that Plaintiffs will incur any additional administrative
   fees in connection with their statutory claims (which they have
25 refused to arbitrate).    Moreover, the administrative fees for "non-
   monetary claims" (which would presumably include requests to
26 determine the scope and validity of an arbitration agreement) are
27 significantly less than those projected by Plaintiffs, and there is
   no evidence that obtaining an arbitral decision on the scope and
28 validity of the arbitration agreement is prohibitively expensive.

1    To resolve Plaintiffs' waiver argument, the applicable law
2    must be determined.   The Dealer Agreement contains a choice of law
3    provision that states: "*Except to the extent governed by federal*
4    *laws* or regulations, the entire relationship of the parties based
5    on this Agreement is governed by the substantive laws of the State
6    of New York, without reference to its choice of law rules."
7    (Woolsey Decl. Ex. B at § 11.1) (emphasis added.)

8    Federal courts in diversity cases look to the law of the forum
9    state in making choice of law determinations. *Fields v. Legacy*
10   *Health Sys*., 413 F.3d 943, 950 (9th Cir. 2005).   Courts in
11   California and New York, however, have recognized that when the FAA
12   applies, whether a party has waiver a right to arbitrate is a
13   matter of federal law not state substantive law. *See Aviation Data,*
14   *Inc. v. Am. Express Travel Related Servs*. *Co*., 152 Cal. App. 4th
15   1522, 1535 (2007) (recognizing that "it is federal law, not state,
16   that governs the inquiry into whether a party has waived its right
17   to arbitration" and noting that "waiver of the right to compel
18   arbitration is not viewed as a question of substantive contract
19   law"); *Singer v. Jefferies & Co.*, 78 N.Y.2d 76, 84 (1991) (stating
20   that with respect to waiver "it appears that Federal law is
21   controlling"); *Danny's Constr. Co. v. Birdair, Inc*., 136 F. Supp.
22   2d 134, 142 (W.D.N.Y. 2000) ("[I]t is federal law, not state, that
23   governs the inquiry into whether a party has waived its right to
24   arbitration.") (citing *Graphic Scanning Corp. v. Yampol*, 850 F.2d
25   131, 133 (2nd Cir. 1988)).   Accordingly, the federal law on waiver
26   is applicable.

27   Under federal law, a party seeking to prove waiver of a right
28   to arbitrate must demonstrate "(1) knowledge of an existing right

19

1  to compel arbitration; (2) acts inconsistent with that existing
2  right; and (3) prejudice to the party opposing arbitration
3  resulting from such inconsistent acts." *Brown v. Dillard's, Inc.*,
4  430 F.3d 1004, 1012 (9th Cir. 2005); *United States v. Park Place*
5  *Assocs., Ltd.*, 563 F.3d 907, 921 (9th Cir. 2009).[9] The "waiver of
6  the right to arbitrate is disfavored because it is a contractual
7  right, and thus any party arguing waiver of arbitration bears a
8  heavy burden of proof." *Park Place Assocs., Ltd.*, 563 F.3d at 921
9  (internal quotation marks omitted); *see also Thyssen, Inc. v.*
10 *Calypso Shipping Corp.,* 310 F.3d 102*,* 104-05 (2d Cir. 2002)
11 ("[T]here is a strong presumption in favor of arbitration[, and]
12 waiver of the right to arbitration is not to be lightly inferred."
13 (alterations in original) (internal quotation marks omitted); *Saint*
14 *Agnes Med. Ctr.*, 31 Cal. 4th at 1195 ("[W]aivers" of the right to
15 arbitrate "are not to be lightly inferred and the party seeking to
16 establish a waiver bears a heavy burden of proof").

17      Defendants conceded they knew of the right to arbitrate,
18 establishing the first element.  As to the second element,
19 according to Plaintiffs, Defendants acted inconsistently with the
20 right to arbitrate in multiple respects.  First, Defendants pursued
21 mediation of the commission claims and delayed the mediation
22 efforts instead of proceeding with arbitration.  Second, Defendants

23

24      [9] These factors are also relevant to the waiver issue under
25 California substantive law, New York substantive law, and federal
   law in the Second Circuit. *See Aviation Data, Inc.*, 152 Cal. App.
26 4th at 1537 (citing *St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 31
   Cal. 4th 1187, 1195 (2003)); *Stark v. Molod Spitz DeSantis & Stark,*
27 *P.C.,* 9 N.Y.3d 59, 66-67 (2007); *Flynn v. Labor Ready, Inc.* 775
28 N.Y.S.2d 357, 493 (N.Y. App. Div. 2004); *Thyssen, Inc. v. Calypso*
   *Shipping Corp.*, *S.A.*, 310 F.3d 102, 104-05 (2d Cir. 2002).

removed Plaintiffs' state-court complaint and filed an answer with counterclaims instead of promptly moving to compel arbitration of Plaintiffs' claims.

### 1.   Mediation-Related Activity

The argument that Defendants' agreement to mediate is an act inconsistent with their right to arbitrate is unpersuasive.  It was *Plaintiffs* who initially proposed mediation instead of arbitration. On May 15, 2006, through their counsel, Plaintiffs wrote to Defendants about the dispute over the unpaid commissions and stated that they wanted to mediate the matter:

> We are hopeful that a meeting of the minds can be reached regarding this matter. However, should Cingular Wireless be unwilling to meet Ms. Madrigal's demand, we believe that mediation within the next sixty (60) days would be advisable to avoid further legal action.  Should Cingular be unwilling to submit this matter to mediation please consider this letter as a demand for arbitration pursuant to the contractual agreement between Cingular and Atzek Cellular, Inc.

(Swingle Decl. Ex. A.)   Because Plaintiffs specifically proposed mediation in the first place, Plaintiffs cannot fault Defendants for agreeing to mediate instead of pursuing arbitration. *See also Walker v. J.C. Bradford & Co.,* 938 F.2d 575, 578 (5th Cir. 1991) ("Attempts at settlement, however, are not inconsistent with an inclination to arbitrate and do not preclude the exercise of a right to arbitration."); *Langfitt v. Jackson*, 644 S.E.2d 460, 464 (Ga. Ct. App. 2007) ("Mediation is designed to resolve disputes without litigation, and thus is not inconsistent with the purposes of arbitration.").

Plaintiffs also contend that Defendants' delay in getting the mediation on track, or Defendants' stalling of the mediation efforts, was inconsistent with their right to arbitrate.

21

1    Shortly after Plaintiffs proposed mediation, on June 2, 2006,

2    Defendants agreed to "non-binding mediation." (Swingle Decl. Ex.

3    B.)   At that time, Defendants stated that they would contact

4    Plaintiffs "regarding the details and coordination of the

5    mediation." (*Id.*)   On June 12, 2006, Plaintiffs sent a

6    correspondence to Defendants indicating that they (Plaintiffs) had

7    not heard back from Defendants. (Swingle Decl. Ex. C.)   Plaintiffs

8    stated that although the parties "are agreeable to mediating this

9    matter," this does not "invalidate our previous demand for binding

10   arbitration." (*Id.*)   Plaintiffs proposed a specific mediator and

11   stated that they looked forward "to your prompt response." (*Id.*)

12        According to Plaintiffs, as late as September 2006, they were

13   still trying to get a commitment from Defendants about a date for

14   mediation. (Swingle Decl. ¶ 6.)   Plaintiffs contacted the office of

15   the proposed mediator and obtained dates of his availability.

16   (Swingle Decl. Ex. D.)   On September 13, 2006, Plaintiffs sent

17   Defendants a correspondence listing three days in October 2006 the

18   mediator had available. (*Id.*)   On September 26, 2006, Defendants

19   wrote back that they were unavailable on those dates and requested

20   to be advised of dates in November and December when Plaintiffs and

21   the mediator would be available. (Swingle Decl. Ex. E.)

22   Subsequently, on October 5, 2006, Defendants proposed December 4

23   and December 18, 2006, as dates for the mediation. (Swingle Decl.

24   Ex. F.)   Plaintiffs wrote back on October 9, 2006, to confirm that

25   the mediation would go forward on December 4. (Swingle Decl. Ex.

26   G.)   Defendants, however, later requested that the mediation take

27   place on December 22 and Plaintiffs agreed. (Swingle Decl. ¶ 8, Ex.

28   H.)   Ultimately, after further correspondence between the parties,

1   the mediation never occurred. (Swingle Decl. Ex. J.)

2        One weakness in Plaintiffs' delay argument — that Defendants'

3   delay in proceeding with mediation is inconsistent with their right

4   to arbitrate — is that only the commission claims were a part of

5   the mediation efforts.  The *statutory* claims were not a part of the

6   mediation efforts — they were asserted in the original state-court

7   complaint filed November 18, 2008, and again in the FAC filed March

8   5, 2009.   The *commission* claims, which are not asserted in the

9   original complaint or the FAC, are not a part of this lawsuit and

10  Defendants' motion to compel does not cover them.   Whatever delay

11  in mediation is attributable to Defendants, it is not necessarily

12  inconsistent with their right to arbitrate the *statutory claims*

13  which were asserted by Plaintiffs well *after* efforts to mediate the

14  commission claims failed.

15       Assuming, *arguendo*, that Defendants' delay in mediation of the

16  commission claims is inconsistent with their right to arbitrate the

17  statutory claims (or any others), Plaintiffs have not demonstrated

18  prejudice from this delay.   Plaintiffs contend that they suffered

19  prejudice from Defendants delay in mediation because it ultimately

20  caused their claims to be barred by the contractual limitations

21  period in the arbitration agreement.

22       Plaintiffs point to an e-mail correspondence from Defendants

23  dated December 11, 2006, days before the scheduled mediation.

24  (Swingle Decl. Ex. H.)   In this e-mail, Defendants took the

25  position that "all" of Plaintiffs claims were time-barred:

26           It appears that Atzek contends Cingular owes it over $2M
             in commissions for customers that Atzek subscribed to
27           Cingular's service as far back as 2004.  Bradley's letter

28

1    **[on May 15, 2006] also contains an arbitration demand.**

2    **Attached is a copy of the Atzek Dealer Agreement. It is**
     **Cingular's contention that under Section 10.2.2.**
3    **Limitations of Actions, all of Atzek's claims are time**
     **barred as this section requires Atzek to initiate**
4    **arbitration by demanding the same in writing 'not later**
     **than 180 days after the act or omission giving rise to**
5    **the claim or dispute occurred.' If Atzek fails to do so,**
     **its claims are time barred. For your convenience, I quote**
6    **below Section 10.2.2. in its entirety. Arbitrators in**
     **similar disputes between Cingular and its dealers have**
7    **upheld and enforced Section 10.2.2. Bradley's May 15,**
     **2006, letter is the only written arbitration demand that**
8    **Atzek has served on Cingular. Accordingly, if this**
     **matter is submitted to arbitration, I believe Atzek's**
9    **claims would be time barred and the arbitrator would find**
     **for Cingular.**

10   (*Id.*)  **Section 10.2.2 of the Dealer Agreement provides:**

11
     **All claims and disputes covered by this section 10 must**
12   **be submitted to arbitration by initiating the arbitration**
     **not later than 180 days after the act or omission giving**
13   **rise to the claim or dispute occurred . . . The failure**
     **to initiate arbitration within the period constitutes an**
14   **absolute bar to the institution of any proceedings based**
     **on such act or omission.  The aggrieved party must**
15   **initiate arbitration under this section 10 by sending**
     **written notice of an intention to arbitrate to all**
16   **parties.  The notice must contain a description of the**
     **dispute, the amount involved, and the remedy sought.**

17

18   Notwithstanding Defendants' argument in their December 11 e-mail

19   that all of Plaintiffs' claims were time-barred by section 10.2.2.,

20   in hopes of "resolving this matter before the scheduled mediation,"

21   Defendants requested information from Plaintiffs including the date

22   the claimed compensation was earned, the amount of the claimed

23   compensation, and the nature of the claimed compensation. (Swingle

24   Decl. Ex. H.)  On December 12, 2006, Plaintiffs responded. (Swingle

25   Decl. Ex. I.)  Plaintiffs stated that they wanted to proceed with

26   mediation and would provide Defendants, in advance of the

27   mediation, with documentation and their "forensic accountant's

28
                                    **24**

report" substantiating their commission claims. (*Id.*)  Later that day, Defendants wrote back asking to reschedule the mediation for some time in the next four weeks to provide adequate time to review Plaintiffs' forensic accountant report and supporting documentation. (Swingle Decl. Ex. J.)  The mediation was taken off schedule and there is no indication in the submissions that Plaintiffs ever provided the forensic accountant's report and documentation to Defendants.  Ultimately, the mediation never occurred.

Plaintiffs' prejudice argument is premised on the theory that Defendants' delay in mediation pushed their claims beyond the 180-day limit in section 10.2.2, *i.e.*, that Defendants' caused Plaintiffs' non-compliance with the 180-day time limit in section 10.2.2.  This contention is erroneous.

As of (and prior to) May 15, 2006, Plaintiffs were represented by counsel and on May 15, 2006, Plaintiffs had the ability to initiate arbitration of their statutory claims in accordance with the arbitration agreement.  Nothing Defendants did prevented Plaintiffs from complying with section 10.2.2. As of May 15, 2006, when Plaintiffs' wrote Defendants that they wanted to mediate the commission claims instead of arbitrating them, Plaintiffs could have initiated arbitration of the statutory claims.  That Plaintiffs failed to do so is not Defendants' fault.

All of the statutory claims in the FAC (like the original complaint) are based on the alleged wrongful termination of the Dealer of the Agreement (*see* Doc. 13 at 6, 8-11), claimed to be unlawful under different statutes.  The Dealer Agreement terminated

1  effective April 1, 2006. (Doc. 13 at 8; Doc. 16 at 10.)   On

2  December 24, 2005, Defendants notified Plaintiffs that the Dealer

3  Agreement would be terminated. (Doc. 13 at 4; Doc. 16 at 10.)

4  Whether the date the Dealer Agreement was terminated (April 1,

5  2006) or the date of notification (December 24, 2005) is considered

6  the date of the "act or omission" giving rise to the statutory

7  claims, when Plaintiffs' counsel proposed mediation of the

8  commission claims on May 15, 2006, 180 days had not passed

9  following the termination of the Dealer Agreement or the

10 notification of termination.   At that time and for some time

11 thereafter, Plaintiffs could have raised and initiated arbitration

12 of their statutory claims.   Any delay in Defendants' mediation

13 efforts did not affect Plaintiffs' ability and unilateral right to

14 commence arbitration of their statutory claims.   Nor did delay in

15 mediation impinge in any way Plaintiffs' ability to initiate

16 arbitration of the commission claims.[10]   Plaintiffs were not

17 prejudiced by Defendants' delay in mediation – Defendants conduct

18 did not cause any of Plaintiffs' claims to fall outside the 180-day

19 limit.[11]

20

21      [10] To the extent Plaintiffs' commission claims were based on
   2004 commissions owed, these claims fell outside the 180-day limit
22 before the parties agreed to pursue mediation.

23      [11] Plaintiffs' prejudice argument – that the delay in mediation
   caused their claims to fall outside the 180-day limit in section
24 10.2.2 – is also premised on the theory that their correspondence
   on May 15, 2006, in which they requested arbitration as an
25 alternative to mediation, failed to satisfy the requirements of
   section 10.2.2.   If their May 15, 2006, correspondence satisfied
26 the requirements of section 10.2.2., then their argument that
   Defendants caused their non-compliance with section 10.2.2. and its
27

28                              26

1  Plaintiffs suggest that they did not pursue arbitration
2  because they were "lull[ed]" into mediation. (Doc. 20 at 15.)
3  However, Plaintiffs, who proposed mediation themselves and who were
4  represented by counsel, were well aware that mediation is not
5  always successful.   The parties were not required to reach a
6  settlement, and no enforceable promises or representations were
7  made that a settlement would be reached in mediation.   Defendants
8  agreed to "non-binding" mediation.   No conduct by Defendants
9  prevented Plaintiffs from complying with section 10.2.2 to preserve
10 their claims if the mediation failed.

11  As to other forms of potential prejudice, Plaintiffs do not
12 contend, and there is no evidence, that through agreeing to mediate
13 and delaying the process, Defendants were able to gain documents or
14 information that they would not have been otherwise able to obtain
15 in arbitration. *Cf. Saint Agnes Med. Ctr.*, 31 Cal. 4th at 1204
16 ("[C]ourts have found prejudice where the petitioning party used
17 the judicial discovery processes to gain information about the
18 other side's case that could not have been gained in
19 arbitration.").   There is no evidence that by agreeing to mediate

20

21  180-day limit would be erroneous.  Whether and to what extent this
22 correspondence (or any other) was sufficient to initiate
23 arbitration of the commission claims, or of both the commission
24 claims and the statutory claims, need not be determined at this
   time.   These are matters that can be addressed by the arbitrator.
25 *See Howsam*, 537 U.S. at 85 (quoting comments to the Revised Uniform
   Arbitration Act of 2000 which state that "issues of procedural
26 arbitrability, *i.e.*, whether prerequisites such as *time limits*,
   notice, laches, estoppel, and other conditions precedent to an
27 obligation to arbitrate have been met, are for the arbitrators to
   decide").

28

and delaying mediation, Defendants caused Plaintiffs to incur excessive fees. *Id.* at 1203 (stating that "[b]ecause merely participating in litigation, by itself, does not result in a waiver, courts will not find prejudice where the party opposing arbitration shows only that it incurred court costs and legal expenses"); *Thyssen, Inc.,* 310 F.3d at 105 (finding no waiver of arbitration where the party claiming waiver "did not face excessive costs.").

Defendants' agreement to mediate and their delay in getting the mediation on track was not inconsistent with their right to arbitrate Plaintiffs' statutory claims, which were asserted only after the mediation efforts failed, and Plaintiffs did not suffer the requisite prejudice. Defendants did not prevent Plaintiff from complying with section 10.2.2., did not gain documents or information from the failed mediation attempt that they would not have been able to obtain in arbitration, and did not cause Plaintiffs to incur excessive fees in the process. Defendants' agreement to mediate and their delay in mediating is not a waiver of their right to arbitrate. This conclusion is further supported by the fact that well after the mediation efforts failed, Plaintiffs specifically requested that Defendants arbitrate the commission claims, acknowledging the continuing vitality of the arbitration agreement. (Corwell Decl. Ex. A.)

## 2. Lawsuit-related activity

Plaintiffs argue that Defendants acted inconsistently with their right to arbitrate by removing Plaintiffs state-court complaint and filing an answer and counterclaims instead of

28

promptly moving to compel arbitration.  Plaintiffs' argument is not persuasive.

At no point prior to Plaintiffs' filing their state-court complaint did Plaintiffs ever demand arbitration of their statutory claims.  The statutory claims were raised in Plaintiffs' state-court complaint.  Defendants' exercise of their right to remove the state-court action to federal court and filing an answer with counterclaims (without litigating them) is not sufficiently inconsistent with their right to arbitrate. *See Halim v. Great Gatsby's Auction Gallery, Inc.,* 516 F.3d 557, 562 (7th Cir. 2008) (concluding that removal does not constitute a waiver); *PPG Indus., Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107 (2d Cir. 1997) (concluding that "a party waives its right to arbitration when it engages in *protracted litigation* that prejudices the opposing party") (emphasis added); *Great W. Mortgage Corp. v. Peacock*, 110 F.3d 222, 233 (3d Cir. 1997) ("Indeed, a party waives the right to compel arbitration only in the following circumstances: when the parties have engaged in a *lengthy course of litigation*, when extensive discovery has occurred, and when prejudice to the party resisting arbitration can be shown." (emphasis added)); *Creative Telecomms., Inc v. Breeden,* 120 F. Supp. 2d 1225, 1232 (D. Haw. 1999) ("Courts have found that the filing of a complaint, an answer, a counterclaim or a third-party complaint does not waive the right to pursue arbitration."); *Saint Agnes Med. Ctr.*, 31 Cal. 4th at 1203 ("[M]erely participating in litigation, by itself, does not result in a waiver" of arbitration).  A party can move to compel arbitration in both state and federal court.  In their

29

1   answer Defendants specifically asserted that Plaintiffs were in
2   violation of the arbitration clause (Doc. 13 at 7), and Defendants
3   filed a motion to compel arbitration. Invoking federal
4   jurisdiction, asserting the arbitrability of the dispute in an
5   answer, and pleading (without litigating) counterclaims does not
6   constitute a waiver.[12]

7       Even assuming, *arguendo*, that Defendants' removal, answer and
8   counterclaims are facially inconsistent with their right to
9   arbitrate, Plaintiffs have suffered no prejudice.

10      The statutory claims Plaintiffs assert were raised in their
11  state-court complaint filed November 18, 2008. Defendants' timely
12  removed the action in January 2009 after being served with the
13  complaint. Defendants filed their responsive pleading shortly
14  thereafter (January 12, 2009) asserting that Plaintiffs violated
15  the mandatory arbitration provision. In February 2009, Defendants'
16  counsel wrote to Plaintiffs' counsel to demand arbitration;
17  Plaintiffs refused. Defendants filed their motion to compel
18  arbitration in April 2009, less than four months after removing
19  this action to federal court, less than six months after the state-
20  court action was filed, and just over two months after their formal
21  demand for arbitration.

22      Plaintiffs have not shown sufficient prejudice arising from
23  Defendants' removal and filing of a responsive pleading, or
24
25
26      [12] Defendants do not seek to avoid arbitration of their
    counterclaims. Through their motion, they seek an order compelling
27  "arbitration of all claims and counterclaims asserted in this
    action." (Doc. 17 at 1.)
28

Defendants' "delay" in moving to compel arbitration.  The record does not reflect that Defendants have litigated their counterclaims, engaged in significant discovery (or any discovery), or caused Plaintiffs to incur excessive fees due to any "delay" in seeking to compel arbitration. *See Brown*, 430 F.3d at 1012 ("Unsurprisingly, courts are reluctant to find prejudice to the plaintiff who has chosen to litigate, simply because the defendant litigated briefly (e.g., by filing a motion to dismiss or requesting limited discovery) before moving to compel arbitration."); *Thyssen, Inc.,* 310 F.3d at 105 (finding no waiver of arbitration where the party claiming waiver "did not face excessive costs," and further noting that even "[t]hough there was a significant length of time between the filing of the complaint and the assertion of [defendant's] right to arbitrate, there was no evidence of extensive discovery or substantive motions by [defendant]".); *Lake Commc'ns, Inc. v. ICC Corp*., 738 F.2d 1473, 1477 (9th Cir. 1984) (finding no prejudice where "only limited discovery has occurred," including one deposition)[13]; *Saint Agnes*, 31 Cal. 4th at 1203-04.

Plaintiffs have not met their burden to establish waiver. Plaintiffs have not shown that Defendants' conduct in removing Plaintiffs' action and filing an answer with counterclaims, instead of moving immediately to compel arbitration of Plaintiffs' claims,

[13] *ICC Corp* was later overruled on other grounds by *Mitsubishi Motors*, 473 U.S. at 632-35.

constitutes a waiver.[14]   These acts were not sufficiently inconsistent with Defendants' right to arbitrate and even if they were, Plaintiffs have not shown the requisite prejudice. Defendants did not waive their right to arbitrate.

**D.   Plaintiffs' Request For Jury Trial**

Plaintiffs have filed a one-paragraph demand for jury trial (Doc. 21.) Plaintiffs argue that the FAA "provides that a party alleged to be in default of arbitration agreement may demand a jury trial of the issue. 9 U.S.C. § 4." (*Id.*)  Plaintiffs note that in the answer to the FAC, Defendants have alleged that Plaintiffs are in violation of the contractual arbitration agreement.

When a party brings a motion to compel arbitration under section 4 of the FAA,

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the *failure to comply therewith is not in issue*, the court shall make an order directing the parties to proceed to arbitration in accordance with the

---

[14] Plaintiffs also contend that Defendants, in asserting their counterclaims, failed to comply with section 10.2.2. Plaintiffs assert that the counterclaims are "substantially" barred by the 180-day limitations period in section 10.2.2, and that Defendants' failed to give them notice of an intent to arbitrate the counterclaims as required by section 10.2.2. Even assuming this is true, and assuming that Defendants' assertion of counterclaims is sufficiently inconsistent with Defendants' right to arbitrate, again Plaintiffs have not shown they have been sufficiently prejudiced by Defendants' conduct. Moreover, Plaintiffs can argue to the arbitrator that Defendants have failed to comply with section 10.2.2. and that this bars their counterclaims. *See Howsam*, 537 U.S. at 85 (quoting comments to the Revised Uniform Arbitration Act of 2000 which state that "issues of procedural arbitrability, *i.e.*, whether prerequisites such as *time limits*, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide").

1
2
3
4
5
6
7
8
9

> terms of the agreement. . . . *If* the making of the arbitration agreement or *the failure, neglect, or refusal to perform the same be in issue*, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. *Where such an issue is raised*, *the party alleged to be in default may*, except in cases of admiralty, on or before the return day of the notice of application, *demand a jury trial* of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.

9 U.S.C. § 4 (emphasis added). Plaintiffs' demand for jury trial rests on the flawed premise that their "failure, neglect, or refusal" to comply with the arbitration agreement is "in issue."

Defendants have demanded and Plaintiffs have resisted arbitration of their statutory claims, arguing, among other things, that the arbitration agreement does not encompass their statutory claims and it is invalid on unconscionability grounds. The parties agreed, however, to have their disputes over the scope and validity of the arbitration agreement decided by an arbitrator, and this has not yet occurred. The FAA "authorizes a federal district court to issue an order compelling arbitration if there has been a failure, neglect, or refusal to comply with the arbitration agreement." *Shearson/Am. Express, Inc.*, 482 U.S. at 226. It is apparent that Plaintiffs have not complied with the arbitration agreement – there is no need for a jury to make this determination. Their "failure, neglect, or refusal to comply" is not "in issue," *i.e.*, there is no triable issue of fact that Plaintiffs have not complied and will not comply unless ordered to do so. Plaintiffs' request for a jury

trial is **DENIED.**

## V.   CONCLUSION

**Upon granting a motion to compel arbitration a court must issue an "order directing the parties to proceed to arbitration in accordance with the terms of the [arbitration] agreement." 9 U.S.C. § 4.   For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED.**

**Plaintiffs and Defendants shall proceed to arbitration in accordance with the terms of their arbitration agreement and arbitrate their dispute over: (1) whether the claims in this lawsuit, or any of them, fall within the scope of the arbitration agreement, and (2) whether the arbitration agreement is valid; and if so, the parties shall arbitrate all such claims.**

**Although Defendants' motion seeks a broader order compelling the parties to proceed to arbitration of Plaintiffs' statutory claims and Defendants' counterclaims, the arbitrator must fist determine the scope and validity of the arbitration agreement.**

IT IS SO ORDERED.

**Dated:   August 17, 2009**          **/s/ Oliver W. Wanger**
                              UNITED STATES DISTRICT JUDGE